STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

DANIEL PASTOR (CABN 297948)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    daniel.pastor@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>GREGORY MASZTAL,<br><br>    Defendant. | CASE NO. CR21-0016 (CRB)<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS AND REQUEST FOR *FRANKS* HEARING**<br><br>Hearing Date: October 13, 2021<br>Time: 1:30 p.m.<br>Location: 17th Floor – Ctrm. 6 |

### I.    INTRODUCTION AND SUMMARY OF ARGUMENT

On June 25, 2020, Defendant Gregory Masztal was charged by criminal complaint with Possession with Intent to Distribute 50 Grams and More of a Mixture and Substance Containing Methamphetamine.[1] On June 24, 2020, the FBI executed a federal search warrant on a Daly City Public Storage unit rented by Masztal, where agents found approximately 4,992 grams of powder that tested positive for methamphetamine, a Glock 9mm pistol registered to Masztal, and ammunition. The following day—June 25, 2020—the FBI searched Masztal's residence on Forest Side Avenue in San Francisco pursuant to the same federal search warrant. At Masztal's residence, the FBI found: over

---

[1] Masztal was charged with the same offense by Information on January 11, 2021 and subsequently waived Indictment.

1,000 reddish-orange pills stamped with "AD" on one side, and "30" on the opposite side (resembling the markings on genuine 30mg Adderall pills); a pill press machine for manufacturing pills; punches and dies that are used to manufacture pills; U.S. Postal Service mailing and packaging materials; and approximately $7,240 in cash.  Agents seized and searched Masztal's electronic devices. They located credentials for multiple cryptocurrency wallets and seized cryptocurrency valued at approximately $170,000.

Masztal was advised of his *Miranda* rights and chose to speak to agents.  Masztal admitted to the FBI that he operated the darknet vendor account "neverdry" on the darknet's Empire Marketplace. Masztal admitted to manufacturing counterfeit Adderall pills with the pill press found at his residence. He told agents that he put approximately 3mg of methamphetamine into each pill.

Masztal now moves the Court to suppress evidence obtained from the search of his residence on June 25, 2020.  *See* Dkt. 36 ("Motion to Suppress Evidence") (hereafter "Mot."); however, Masztal concedes that there was probable cause to search his Public Storage unit on June 24, 2020.  *Id.* at 11 ("A trained canine alerted to the presence of a controlled substance in the storage unit. *Certainly, this factual basis gives rise to probable cause to search the storage unit . . . .*") (emphasis added).  Given that Masztal concedes there was probable cause to believe his storage unit contained controlled substances (and the storage unit contained sufficient evidence to prove the charge against him), the only issue his motion actually raises is whether the warrant contained a sufficient nexus to Masztal's residence.  *See* Mot. at 11 ("there is no nexus to Mr. Maztal's home in these facts").

As a matter of law, "[d]irect evidence that contraband or evidence is at a particular location is not essential to establish probable cause to search the location . . . In the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986).  In addition, the specific facts in the affidavit amply supported probable cause to search Masztal's residence.  Masztal provided his California Driver's License to rent a Public Storage unit.  Agents found a copy of Masztal's California Driver's License contained within the rental agreement they obtained from Public Storage for tenant "Greg Mazda."  Dkt. 36-1 ¶ 45 (Exhibit A to Motion to Suppress – "Affidavit in Support of Search Warrants) (hereafter "Aff.").  An employee at the storage unit location, who was shown a photo of Masztal, also identified Masztal as the renter.  *Id.*  In addition,

security camera video from the Public Storage facility showed an individual matching Masztal's description entering Public Storage on June 6, 2020. *Id.* ¶ 46. Public Storage gave consent for the FBI to have a trained narcotics canine conduct a sniff on June 11, 2020. *Id.* ¶ 50. The dog alerted to Masztal's rental unit as containing the odor of controlled substances. *Id.* Furthermore, the search warrant advised the magistrate, based on the affiant's training and experience, that "narcotics traffickers will often attempt to conceal the location of their illicit goods by renting storage units and utilizing a name alternative to their own . . . [to] separate their home address from law enforcement investigations" (*id.* ¶ 48), which Masztal did by renting the unit under the name Greg Mazda (*id.* ¶ 45). The warrant also contained a number of observations about the types of evidence that are commonly found at the residence of a person involved in distributing controlled substances based on the affiant's experience. *See generally id.* ¶ 23. These facts gathered from the FBI's investigation established probable cause to search Masztal's residence.

But even if the facts above were not a reasonable nexus to Masztal's apartment, the FBI had gathered additional facts that supported a search of Masztal's residence. In May and June 2020, the FBI conducted an undercover operation to gather evidence on Masztal and Dupuis' darknet drug selling operation. On May 28, 2020, the FBI observed Masztal's co-conspirator Chaz Dupuis place parcels into mailboxes on 29th Street in San Francisco. Aff. ¶¶ 28-30. Masztal had listed "Chaz Ryan" (Dupuis' first and middle names) and Dupuis' phone number as the secondary contact for the Public Storage unit. *Id.* ¶ 49. After seeing Dupuis mail the parcels, agents intercepted the parcels and noted that they were addressed to fictitious personas that the FBI used to place drug orders on the darknet. *Id.* ¶¶ 31-32. After the parcels were photographed, agents allowed them to continue in the mail until they reached undercover law enforcement addresses. *Id.* ¶ 33. Agents then opened the parcels and found "reddish-orange pills resembling genuine 30 mg Adderall . . ." *Id.* ¶¶ 33-36. The pills tested presumptively positive for the presence of methamphetamine with a TruNarc spectrometer. *Id.* ¶¶ 35-36. Two days before Dupuis mailed the counterfeit Adderall pills, agents had observed Masztal enter a basement residence on Forrest Side Avenue in San Francisco. *Id.* ¶ 39. About an hour later, Dupuis drove up, parked, and walked to Masztal's residence carrying a backpack. *Id.* ¶ 41. Around forty minutes after he arrived, Dupuis departed and returned to his vehicle. *Id.* ¶ 42.

Given that the facts gathered by law enforcement and presented to the magistrate established probable cause, whether or not agents had learned any additional information about Masztal and Dupuis's darknet operation from a Confidential Informant ("CI"), is irrelevant. *United States v. Johns*, 948 F.2d 599, 606-07 (9th Cir. 1991) ("The government need not include *all* of the information in its possession to obtain a search warrant."). The affidavit supports probable cause apart from the CI. Equally important, the affidavit does not rely on the CI's credibility or on unverified information from the CI.

Finally, the alleged omission, on which Defendant's motion is based, is not misleading. Masztal ignores key facts in the affidavit that clearly conveyed that: (1) Person 1 was "one of the individuals" involved in the sale of controlled substances on the darknet (Aff. ¶¶ 24-27) – (by definition, a criminal); (2) the FBI had seized control of the vendor account that Person 1 and others had used to advertise Adderall (*id.* ¶ 24); and (3) the FBI had taken control of Person 1's electronic devices and Person 1's email account (*id.* ¶¶ 24-25). Given that context, it would not be logical to assume (as the Motion argues) that Masztal was Person 1 (a person whose electronic devices and email the FBI had already reviewed) because the affidavit sought authorization to search and seize Masztal's electronic devices.

## II.  LEGAL STANDARDS

### A.  Standard Review for Magistrate's Probable Cause Determination

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. AMEND. IV. "Probable cause for a search requires a fair probability that contraband or evidence of a crime will be found in a particular places, based on the totality of the circumstances." *United States v. Grant*, 682 F.3d 827, 832 (9th Cir. 2012) (internal quotation marks omitted). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Westby*, 138 S. Ct. 577, 586 (2018). Reviewing courts should accord "great deference" to a magistrate's determination of probable cause. *United States v. Bohannon*, No. 19-CR-00039 CRB, 2020 WL 7319430, at *6 (N.D. Cal. Dec. 11, 2020) (quoting *United States v. Schesso*, 730 F.3d 1040, 1045 (9th Cir. 2013)). It should "not be reversed absent a finding of clear error." *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993).

"When a magistrate judge issues a search warrant for a residence, he must find a reasonable nexus between the contraband sought and the residence." *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002). In assessing whether a reasonable nexus to the location to be searched has been shown, the magistrate may consider opinion statements based on the training and experience of the law enforcement affiant. *See United States v. Foster*, 711 F.2d 871, 878 (9th Cir. 1983) (agent's opinion based on his experience that "evidence of the defendants' drug dealings would be found at defendants' residences . . . was an important factor to be considered in the magistrate's determination of probable cause."); *United States v. Elliot*, 322 F.3d 710, 716-717 (9th Cir. 2003) (same).

### B. Required Showings for *Franks* Hearing

In order to be "entitled to an evidentiary hearing on the validity of an affidavit underlying a search warrant, the defendant must "make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).

The defendant "bears the burden of proof and must make a substantial showing to support both elements." *United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002). The facts misstated or omitted must be material to a finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Fowlie*, 24 F.3d 1059, 1066-67 (9th Cir. 1994). A negligent mistake or omission, without more, does not satisfy the state of mind requirement of *Franks* necessary to trigger an evidentiary hearing. *United States v. Garcia-Cruz*, 978 F.2d 537, 541 (9th Cir. 1992). The "inquiry begins with a presumption that an affidavit in support of a search warrant is valid." *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004) (citing *Franks*, 438 U.S. at 155-156). The "defendant's "attack must be more than conclusory and must be supported by more than a mere desire to cross-examine . . . ." *Franks*, 438 U.S. at 171

## IV. ARGUMENT

### A. Defendant Fails to Make Either of the Required Showings for a *Franks* Hearing

#### 1. Defendant Fails to Show Materiality Because the Affidavit Contains Probable Cause Even If the Section Involving "Person 1" is Set Aside.

...

Even if there were an intentional or reckless omission in the search warrant, that is not enough to warrant a *Franks* hearing. "A defendant challenging an affidavit must also show that the affidavit . . . supplemented by the omissions would not be sufficient to support a finding of probable cause." *United States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985), *amended*, 769 F.2d 1410 (9th Cir. 1985); *Chavez-Miranda*, 306 F.3d at 979 ("pivotal question is whether an affidavit containing the omitted material would have provided a basis for a finding of probable cause"). Defendant's motion overstates the importance of the CI and provides *no analysis* for its assertion that disclosure of the CI would have changed the probable cause determination. Whether or not Person 1 consented to the FBI's takeover of the darknet account was not material. The affidavit does not rely on statements by the CI or unverified information from the CI. Facts gathered by the FBI and presented in the affidavit independently established probable cause. *Cf. United States v. Alvarez*, No. 20-CR-00086 (WHO), 2020 WL 4701179, at *7 (N.D. Cal. Aug. 13, 2020) ("Although the CI's information led officers to initiate their investigation, the information they learned during the course of that investigation reduced the CI's importance to a minimum.").

Moreover, even when the section of affidavit discussing Vendor A, Person 1, and Person 2 is set aside, the remainder of the affidavit contains probable cause for both the search of Masztal's storage unit and his residence. Defendant concedes that there was probable cause for the search of his storage unit. The probable cause to search the storage unit, when combined with general facts stated in the affidavit that drug dealers are likely to have evidence of drug dealing at their residences, yielded probable cause to search Masztal's residence. *Cf. United States v. Meling*, 47 F.3d 1546, 1555 (9th Cir. 1995) (omission was not material where it related only to informant's credibility and did not undermine other evidence).

   **a.** **The Narcotics Dog Sniff and Records for Masztal's Storage Unit Established Probable Cause to Search the Storage Unit and Masztal's Residence**

During its investigation, the FBI obtained records from Public Storage that showed a "Greg Mazda" began renting a Daly City storage unit in February 2020. Aff. ¶ 43. Investigators noted that the birthdate, home address, cellular phone number, and California Driver's license provided by "Greg Mazda" matched those of Gregory William Masztal. *Id.* ¶ 45. A photocopy of Masztal's license was

contained in Greg Mazda's rental agreement.  Agents showed a Public Storage employee a photo of Masztal, and the employee identified Masztal as the person who rented the storage unit. *Id.*  Surveillance footage from Public Storage showed an individual matching Masztal's description parking at Public Storage and entering the facility on June 6, 2020. *Id.* ¶ 46.  On June 11, 2020, the manager of Public Storage consented to agents' use of a narcotics dog to sniff for the scent of controlled substances at the facility. *Id.* ¶ 50.  A dog trained to detect the presence of methamphetamine was presented to the front doors of four units within the Public Storage building. *Id.*  The dog alerted to the presence of narcotics after sniffing the door of Masztal's storage unit but did not alert to the presence of narcotics after sniffing the doors of the other three units. *Id.*

Agents reviewed open-source records and conducted criminal history checks that showed Masztal's then residence was on Forest Side Avenue in San Francisco. Aff. ¶ 51.  Agent Clemens further informed the magistrate, based on his training and experience, that "narcotics traffickers will often attempt to conceal the location of their illicit goods by renting storage units and utilizing a name alternative to their own . . . [to] separate their home address from law enforcement investigations." *Id.* ¶ 48.  Masztal had done this by renting the storage unit using the alias Greg Mazda. *Id.* ¶ 48.  The affidavit further stated that persons involved in drug trafficking frequently keep at their residences: financial records, shipping records, receipts, account ledgers, contact address books, drugs and drug paraphernalia, photos and videos of drug-related activity, cryptocurrency information, pill-press machines as well as punches and dies to manufacture pills, and electronic devices that contain the above types of evidence. *Id.* ¶ 23.  The affidavit requested to search Masztal's residence because there was a fair probability that such evidence would be found there.

The alert of the trained narcotics dog at Masztal's storage unit; records showing that the Public Storage unit was rented by and accessed by Masztal; and opinion based on the agent's experience about evidence of drug trafficking often being found at drug traffickers' residences, provided probable cause to search the storage unit *and* Masztal's residence.  Masztal does not challenge the canine sniff of the storage unit.  Nor would any such challenge have merit because "[n]onresidential commercial places are . . . subject to the ordinary rule that dog sniffs do not expose legitimately private information because they reveal only the presence or absence of the odors of contraband." *United States v. Parrilla*, No. 13-

CR-360 (AJN), 2014 WL 2111680, at *9 (S.D.N.Y. May 13, 2014), *aff'd sub nom. United States v. Kirk Tang Yuk*, 885 F.3d 57 (2d Cir. 2018).

### b. Surveillance of Dupuis Visiting Masztal's Residence Two Days Before Dupuis Mailed Controlled Substances Further Cements Probable Cause to Search Masztal's Residence.

Even assuming *arguendo* that the foregoing facts were not sufficient probable cause to search Masztal's residence, the FBI also observed Masztal's co-conspirator Chaz Dupuis visit Masztal's residence for approximately forty minutes two days before agents observed Dupuis mailing the parcels that were found to contain counterfeit Adderall pills. *See* Aff. ¶¶ 28-36. The affidavit informed the magistrate that Dupuis was connected to the storage unit because Masztal had listed "Chaz Ryan" (Dupuis' first and middle names) and Dupuis' phone number as the secondary contact for the unit. The meeting between Masztal and Dupuis at Masztal's apartment, the dog sniff evidence that Masztal's storage unit contained controlled substances, Dupuis' connection to the storage unit, and the well-established fact that evidence of drug dealing is likely to be found where someone who is distributing drugs lives, provided a "reasonable nexus between the contraband sought and [Masztal's] residence." *Chavez-Miranda*, 306 F.3d at 978.

### 2. Defendant Fails to Show an Intentional or Reckless Omission

Masztal argues that the existence of a CI was deliberately obscured from the magistrate through the use of the term Person 1 and that this phrasing "gave the false impression that 'Person 1' was one of the two individuals targeted in the investigation." Mot. at 6. Masztal's argument ignores key facts in the affidavit that make it clear from context that Person 1 was not Masztal. The affidavit declared that: (1) Person 1 operated the Vendor A darknet site that advertised the sale of Adderall pills; (2) the FBI had taken control of the account of Vendor A; and (3) the FBI had "review[ed] the electronic devices and email communications of *one of the individuals* who operated the Vendor A (Person 1)." Aff. ¶ 24 (emphasis added). Although Person 1 was not explicitly identified as a CI, the affidavit clearly conveyed that "Person 1" had been involved in the sale of controlled substances on the darknet through the Vendor A account; that the FBI had seized control of the Vendor A site used to advertise Adderall; and that the FBI was in control of Person 1's electronic devices and Person 1's email account. *Id.*

Defendant's argument that the magistrate was intentionally misled into thinking that Masztal was
Opp. to Def.'s MTS and Franks Hearing Request    8
CR21-0016 (CRB)

Person 1 (Mot. at 1) is conclusory and unsupported by evidence. Masztal and Dupuis were the targets of the search warrant. The affidavit sought authorization to search and seize Masztal's electronic devices. Given that context, the magistrate would not have assumed that Masztal was Person 1 (whose electronic devices and email the FBI had already reviewed). *Contra* Mot. at 7. Had the true identity of Person 1 been a "potentially determinative source of doubt," the "magistrate judge could have inquired [about it]." *United States v. Ruiz*, 758 F.3d 1144, 1149 (9th Cir. 2014). But critically, Defendant fails to make the required showing that the affidavit contains intentional or recklessly misleading omissions. A defendant's "bare assertion" that an omission was deliberate because the agents knew the fact and did not include it in the affidavit does not "establish that the omission was the result of anything other than negligence or innocent mistake." *United States v. Collins* 61 F.3d 1379, 1384 (9th Cir. 1995); *Chavez-Miranda*, 306 F.3d 973, 979 (bare assertion that omission was misleading falls short of preponderance of evidence standard needed to obtain a *Franks* hearing).

### B. Controlled Substances Seized During the Lawful Search of Masztal's Storage Unit Made the Search of His Residence Inevitable.

Assuming *arguendo* that the warrant did not contain probable cause to search Masztal's home, evidence obtained during the search should not be suppressed because its discovery was inevitable in light of the concededly valid search of the storage unit. "The inevitable discovery doctrine acts as an exception to the exclusionary rule . . . and permits the admission of otherwise excluded evidence 'if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police . . . .'" *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)). "To determine whether evidence acquired through an illegal search may be admitted at trial, the court asks whether 'by following routine procedures, the police would inevitably have uncovered the evidence' through lawful means." *United States v. Harris*, 731 F. App'x 718, 719 (9th Cir. 2018) (quoting *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396, 1399 (9th Cir. 1989)). Here, Masztal acknowledges that the search of his storage unit was lawful. Based on the seizure of almost 5 kilograms of a powder that tested positive for methamphetamine from the storage unit, the government would have been able to obtain a warrant for Masztal's residence.

### C. The Good Faith Exception Should Apply and Suppression Is Not Justified.

Even if the search warrant lacked probable cause for Masztal's residence, suppression would not be warranted because agents relied on the warrant in good faith. The exclusionary rule is a judicially created remedy that, "when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). The Supreme Court has "repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Id.* at 141. The exclusionary rule "applies only where it 'result[s] in appreciable deterrence,'" and where the benefits of deterrence outweigh the costs. *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)) (internal citations omitted). Moreover, "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* at 143. To trigger the exclusionary rule, law enforcement conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.

Here, agents reasonably relied on the warrant signed by the magistrate to conduct a search of Masztal's residence one day after agents found a large quantity of methamphetamine in Masztal's storage unit. Given that Defendant has not shown that the omission of the information which forms the basis for his motion was deliberate, reckless, or material, there are no appreciable deterrence benefits to be gained by excluding the evidence. There simply is no requirement that the government must disclose a CI to obtain a search warrant when agents have independently gathered enough evidence to establish probable cause.

## V. CONCLUSION

For the reasons stated above, the Court should deny Masztal's Motion to Suppress and deny his request for a *Franks* hearing.

DATED: August 18, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

_/s/ Daniel Pastor_____
DANIEL PASTOR
Assistant United States Attorney